UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Boom-OS, LLC;
AnneAlise Bonistalli;
A.B. Fit, LLC;

and

FLX Wellness, LLC,

               Plaintiffs,

v.

Dom N' Tom, Inc.,

               Defendant.

Civil Action No.

## COMPLAINT

## INTRODUCTION

1.      The Defendant, Dom N' Tom, Inc.  (alternatively D&T or defendant) made material fraudulent misrepresentations to plaintiffs in order to bind corporate plaintiff, Boom-OS, LLC (Boom or plaintiff) to a software development contract, which D&T, in bad faith, breached in an effort to convert the contract from a fixed price for a delivered product, to an open ended time and materials profit center. D&T breached separate duties it owed to the individual plaintiff, AnneAlise Bonistalli (alternatively AnneAlise or plaintiff) and her health and fitness services businesses, plaintiff A.B. Fit LLC, (alternatively ABFIT or plaintiff ), and plaintiff FLX Wellness, LLC (alternatively FLX or plaintiff).

D&T made misrepresentations to the plaintiffs regarding the duration and cost of the project and acted in a grossly negligent manner in connection with a time critical, fixed fee software development project which Boom, AnneAlise, ABFIT, and FLX needed for their

1

immediate use in the nascent fitness industry. D&T's misrepresentations and other conduct vis-à-vis the plaintiffs constitute unfair and deceptive acts and practices prohibited in trade or commerce and in violation of Massachusetts law, G.L. c. 93A. As a result of the defendant's actionable misconduct, plaintiffs have suffered significant damages, including direct and consequential damages to Boom under the contract and tort damages to the plaintiffs as further detailed herein.

## **BACKGROUND**

Parties, Jurisdiction and Venue:

2.     Plaintiff, Boom-OS LLC, is a Massachusetts corporation with its principal place of business located in Chestnut Hill, Suffolk County, Massachusetts.

3.     Plaintiff, AnneAlise, is a resident of Chestnut Hill, MA, Suffolk County, Massachusetts.

4.     Plaintiff AB Fit LLC is a Massachusetts limited liability corporation with a principal places of business in Chestnut Hill, Suffolk County, Massachusetts.

5.     Plaintiff, FLX Wellness, LLC is a Massachusetts Corporation with a principal place of business in Chestnut Hill, Suffolk county, Massachusetts.

6.     Defendant Dom N. Tom, Inc. is, upon information and belief, a New York corporation with principal places of business in Chicago, Cook County Illinois and New York City, New York County, New York.

7.     Subject matter jurisdiction in this Court is proper pursuant to 28 U.S.C. §1332 as plaintiffs, Boom, AnneAlise, ABFIT, and FLX on the one hand and defendant, D&T on the other

hand are citizens of different states and the amount in controversy exclusive of interest and costs exceeds $75,000.

8.      Personal jurisdiction is proper in this Court as D&T has at all relevant times continuously and systematically conducted business with plaintiffs and upon information and belief others in the Commonwealth of Massachusetts, and because a substantial portion of D&T's conduct at issue in this case was directed toward plaintiffs, who are persons or entities located in Massachusetts.

9.      Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391 as this district is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, and a judicial district in which a substantial part of the property which is the subject of the action is located.

Factual Averments:

10.     AnneAlise Bonistalli is a successful and credentialed fitness professional with an undergraduate degree in Kinesiology and Exercise Science, and certifications from the National Strength and Conditioning Association, USA Track and Field,  Functional Movement Systems, and the Titleist Performance Institute.  She is also a successful health and fitness entrepreneur.

11.     In 2010 as a sole proprietor she developed "a.b. fit" which provided client site based rehabilitation services and personal training.  As her personal training business grew to include more clients in upscale condos and apartments with existing gym facilities, she began consulting with developers of such facilities on facility design and management, including the developers of the Millennium Tower Boston (Millennium), a luxury development in the heart of downtown, with the largest residential fitness center in the city.

iManageDB1\109846\000008\4112616.v1-3/24/22

12.     AnneAlise provided similar fitness facility design and operational management consulting services in 2019 and early 2020 for the San Francisco Four Seasons Private Residences developers through ABFIT in which she would employ a team of providers to then operate and premiere within her first Four Seasons project.

13.     From 2016, until March 2020, via FLX Wellness LLC, AnneAlise was also the Managing Director of Wellness and fitness facilities at Millennium Tower Boston, employing a team of providers and offering a suite of health and fitness services at the upscale Boston residential condominium with the largest residential fitness facility in the city.

14.     Based on her work as a fitness professional, at all relevant times prior to the filing of plaintiffs' complaint, AnneAlise knew that notwithstanding burgeoning public interest in health and fitness, there were no good software applications available for use in the scheduling feedback and personal interactions between and among fitness business customers, the physical trainers provided by the fitness business, or the fitness facility and its management.

15.     Recognizing the critical importance of being early to market with a viable software product for fitness businesses, including her businesses ABFIT and FLX, AnneAlise set out to have customized software developed at a reasonable fixed fee.

16.     The first step in the process involved the hiring of Randy Peterson, an experienced software development expert as a consultant, to assist in developing the detailed specifications for the software developer in January 2020.

17.     AnneAlise understood that timely completion of the software project was essential to her continued success, in the following respects:  individually, as a fitness professional engaged in private client development; with respect to Boom, which AnneAlise

4

formed on February 10, 2020 to own, use, promote and sell the fitness software which D&T

agreed to produce and via plaintiff, FLX, in connection with her services as Managing Director

of the Millennium facility.

18.     From the outset of the relationship between AnneAlise and D&T, and before

contracting, defendant, D&T understood the consequences to plaintiffs of D&T's non-

performance and agreed to comply with plaintiffs timing, process and cost objectives.

19.     For example, AnneAlise's February 2, 2020 initial correspondence with D&T

stated:

> I am in search of a development company for **the build out of a training
> management software**. I have an 8-page specification sheet with a
> description and prioritized features and functions list.
> **With an MVP target date of May 31st and a full production goal of
> July 1, I would like to get started in the next couple weeks**, with the
> first step being the signing of the attached NDA. Once signed, I would like
> to schedule a call with myself and my project consultants to review the
> spec sheet including explanations of pages, workflows, content delivery
> requirements, and role specific user experience descriptions.
>
>
> After sharing the specification and discussing the project in more detail I
> am hoping to receive **a proposal that includes: 1) A breakdown of the
> phases for the project <u>with a timeline and costs –plan, build and run</u>
> 2) Number of resources needed, type of resources and for how long 3)
> Breakdown of expected hosting methodology and costs 4) Pre-
> requisites needed (CSS, Branding, etc.) 5) Overview of your process
> and methodology.**

(Emphasis added.)

20.     The original specification sheet included the software's integration with existing

fitness wearable hardware (e.g. by Garmin). In response, D&T proposed separating the Garmin

integration but otherwise proposing a 5.5 month project with two Phases, "Discovery" including

Research Design, Architecture, and Planning(1.5 mos.) and "Development" including

Engineering + QA (Quality Assurance) Testing (4 mos.) and including "set up" and "hosting" (providing ongoing computer resources for the operation of the software).

21.     Rather than provide a fixed price or detailing all costs, as requested, D&T initially provided an estimate with a range of $364,540 to $414,500 noting:

> Please note that we provide a bit of a range on the cost-estimates due to unknown workflows. Once we get past Phase 1 (Discovery and Planning) we will have as an output a fixed price and timetable for delivery.

> One final note, given that we're launching the software in potentially multiple locations we recommend Deployment and User Testing to carry throughout June to make sure Quality Assurance is kept consistent.

22.     As the negotiations continued, D&T and Boom agreed to narrow the project while maintaining Boom's project completion timing objectives.   For example, on February 20, 2020, D&T reduced its bid to $331,250 noting the following:

Adjustments made

- Adjusted the budget down for a third-party Visual Design contractor to work on the product. We extended the time for design to accommodate accordingly, per the request of our Chief Creative Officer. The reason is that we've never worked with the person so we're anticipating there may be some ramp-up period. If that's not the case, that's fine.

- Took out DevOps/managed services. This would be a better conversation once we are preparing to launch, and have a full understanding on what is needed.

- **Discovery has been reduced to 2 weeks**, which should be enough time to get started on the work. That said, in the schedule we're anticipating some overlap in the Design phase to address any feedback and minor issues as they're needed.

- **The timeline extends to end of June for a Product Launch (commercially active product ready for early adopters) with a July 31st Complete Launch.**

(Emphasis added.)

23.     In response, Boom sought to reduce the quote based on competitive responses

from other vendors to an amount below $200,000 with a response to D&T's point regarding

responsibility for Visual Design:

> In regards to design of the system I do want your designers to be
> responsible for the bulk of the design effort. My branding partner can
> provide a high-level design document with branding guidelines, but I
> anticipate Dom and Tom taking the lead for screen designs.
> For the timeline I will need key functional features like onboarding,
> scheduling, chat, pictures and core content framework in place before
> July. How early do you think we can have a demo version of the UX I
> could use to gather feedback? I am hoping to get a sandbox type
> environment that I can click-through before the launch date with friends
> and mock clients to ensure the functionality works as intended.

24.     On February 21, 2020 D&T agreed to provide the fixed fee proposal requested by

plaintiffs noting:

> **The functionality outlined for July is doable**.
>
> **Budget-wise: I think that this is doable under $200k.** It means a bit of
> tradeoffs but given the conversations that we're aiming for single-tenant
> platform rather than multi-tenant, that reduces costs/scope dramatically
> (from 6 weeks to 2 weeks, for example.) **If we get to do most of the
> designs, and branding / highlevel support is available, that saves time
> and money as well.**
>
> **For a demo of the application, we can <u>one is a high-fidelity clickable
> version of the platform at the end of the Design phase. So in April</u>.**
>                                        ...
> **I'll send out contracts later today.**

(Emphasis added.)

25.     Thereafter on March 2, 2020, AnneAlise (in person) and Boom's project

consultants (via Zoom) met with D&T in Chicago for several hours during which time Boom et

al provided detailed information regarding AnneAlise's existing FLX Software Application, the

7

SF Four Seasons app workflow and branding guidelines along with numerous other programming and client management components essential to Boom's software project.

26.     On March 3, 2020, D&T outlined a proposed schedule, in which D&T would provide Boom with complete customer facing wireframes and a full site map within 15 days from the start of the contract.

27.     The parties continued to negotiate around key timing and final fixed price issues as the impact of Covid on all businesses became clear in mid-March.  Following further negotiations regarding the contract price, Boom and D&T ultimately agreed and on April 10, 2020, executed two documents reflecting their purported agreement, a "Master Services Agreement" or MSA and a Work Order (the "contract documents") for a final "fixed fee" contract price of $154,000.

28.     As set forth in the Contract documents, D&T promised for a "fixed fee" of $154,000 to build Boom "a frontend web application used by personal fitness training clients to manage their training schedule and track progress [and a] backend for the system admin and providers to coordinate and manage clients."

29.     As set forth in the Contract documents, the parties agreed that the work would take 5 months to complete with the agreed estimated projected start date of April 8, 2020.

30.     D&T never performed as agreed, or as represented to plaintiffs prior to contract execution.  Its work was delayed, incomplete, misaligned and in breach of the parties' agreement as further detailed herein.

31.     The Work Order portion of the Contract documents stated plainly:

**The project will be based on a fixed fee basis.** A contract modification, verbal or written between the parties, or Change Work Order may be discussed or executed by the parties to extend the project schedule, budget.

See contract documents (emphasis added).

32.     Boom never agreed to change the project from fixed fee to time and materials, never agreed to change the project schedule, budget or scope.

33.     No substantive contract modifications or Change Work Orders were ever executed or agreed to by Boom.

34.     The 4/10/20 Work Order detailed the Features and Functionality of the software D&T was to build which never changed.

35.     Shortly after the project commenced D&T fell far behind schedule and made significant discovery and design process errors.  D&T used such errors as a lever to change the contract terms back to the time and materials basis it initially quoted.

36.     Specifically,  while knowing that the agreed software approval process included 3 review iterations of the software deliverables, and after sending limited subsets of the wireframes, D&T repeatedly and intentionally sent delayed and incomplete "Wireframes" (images of screen shots) which failed to include Boom's timely feedback in subsequent iterations, and then used that delay and Boom and AnneAlise's reliance on performance to change the nature of the parties agreement to Boom's and AnneAlise's detriment.

9

37.    For example, as early as July 16, 2020, Boom's consultant Randy Peterson noted the following in an email to D&T:

> Hi Everyone,
> We just spent the past hour+ reviewing the latest PDF deliverables of the wireframes. We're concerned that the comments we added to the last InVision prototype aren't reflected in these PDFs. Was there maybe a problem in uploading the right version of the PDFs? Those comments have been there for about 2 weeks now.
> If there are any questions about the comments or if you think it's better to do something differently we're open to suggestions, but we haven't received any requests for clarification so we assumed the comments would be reflected in the final wireframe PDF.
> We can discuss more during the meeting, but we're very motivated to get these wireframes side off on. Let us know what we need to do to help this move forward.

38.    Boom directly addressed these issues again in an August18, 2020 email to D&T:

> I have reviewed the wireframes and there are still numerous items that have not been updated properly. These are not new feature or design requests and are existing requests from previous revisions (See attached - also posted in BOX on July 23rd).
>
> I am at a loss for where the disconnect is here. **Why have the wireframe presentations missed so many requested features from previous revisions and reviews? The most recent wireframes are not complete and do not include item requests from weeks ago. Please review and update the highlighted items in the attached document.**
>
> I expect these to be updated and to have a detailed WO in hand by Thursday August 20th. I am eager to wrap this up so we can move onto the design phase and do not want to lose any more time and money chasing old requests.
>
> Please let me know if anything is not clear.

(Emphasis added.)

39.    D&T repeatedly tried to leverage this conduct into changing the nature of the parties fixed fee contract and to convert it into an open ended time and materials Boom billing opportunity completely untethered to the parties' agreement.

40.     For example, in response to the parties' ongoing discussions about adding

integration with other software from Garmin or Twilio which the parties acknowledged as out of

scope, D&T sought change work orders in June, 2020.

41.     In response, on July 24, 2020 Boom responded:

> In regards to the budget, we should talk it over in more detail.  **I am**
> **expecting that the in-scope items don't change the cost of the project**
> **since they were included in the fixed-price contract that I signed**.
> Obviously I am willing to pay for additions like the Garmin Integration
> and Twilio virtual component added into scope.  I am also open to setting
> up some performance based incentives for finishing the project earlier.
> What I don't want to do is approve an increase in budget now, just to have
> another increase before we get to the finish line.  We need to structure any
> additional payment to be made on my approval of completed modules.

(Emphasis added.)

42.     In reply, on July 27, 2020, D&T tried to avoid its fixed price agreement by

leveraging its already delayed performance and by suggesting that in scope items were more

detailed than as originally understood, and thus "out of scope", thereby acknowledging that in

making the timing and cost misrepresentations which lead to the parties' contract, D&T never

intended to perform as agreed.  Instead, it decided to use its timing leverage and control over the

process to extract additional compensation from Boom.

43.     Boom refused to convert the contract to time and materials.

44.     Despite repeated efforts by Boom to get the project back on track, it increasingly

became clear that D&T would never properly complete the work leaving Boom in the lurch, and

eventually causing the failure of at least two specific commercial opportunities as noted below

and potentially many more.

45.     On December 29, 2020, Boom, through counsel issued a formal dispute notice to

D&T which noted, *inter alia*:

> As you will recall, the Parties conferred on December 22, 2020 to discuss the status of the timeline and deliverables identified in the Work Order. Despite the efforts of Boom, no resolution was reached at this meeting to address the deficiencies discussed.
>
> In the Work Order, the Parties expressly agreed to engage in this relationship in a structured manner that would develop in phases. During the first phase, identified as the "Discovery Phase," the Parties agreed to develop business objectives and assess the technical requirements for the project so it could proceed in a timely and efficient fashion. **Despite agreeing to this basic straightforward process, the Company recognized that their initial project manager assigned to this project did not fully comprehend the detailed nature of this task. Boom put the Company on notice that the Discovery Phase was not performed properly. Specifically, neither the business objectives nor the technical requirements identified during the course of this phase were agreed upon by Boom prior to moving the project along to the next phase.**
>
> **These discrepancies were continuously identified and ignored by the Company which necessitated multiple meetings and emails between the Parties to discuss this feedback that was never addressed or incorporated into the project.**
>
> **[F]urther recognizing that the Discovery Phase was not completed properly, [D&T] attempted to shift the burden of this mismanaged project to Boom by issuing change work orders and attempting to increase the cost of the project to exorbitant amounts, well above the fixed fee arrangement that the Parties agreed to.**

(Emphasis added)

46.     D&T's misrepresentations and conduct including its failure to timely complete its

performance has directly and proximately harmed the plaintiffs.

47.     For AnneAlise/FLX, the failure to have a functional software product available

for use in managing the Millennium facility precluded a timely resumption of their delivery of

personal training services to Millennium residents by July, 2020 either via on line sessions or in person as Covid requirements relaxed to permit such reopenings.

48.     In addition, the inability to offer Millennium Branded fitness facility management software contributed to the loss of revenue by AnneAlise/FLX from at least July 31, 2020 through the March 21, 2021 contract termination date.

49.     AnneAlise, ABFIT and/or Boom have been damaged by having been unable to use and profit from the use of the software for existing and potential customers, like the San Francisco Four Seasons Private Residences facility.

50.     Notwithstanding D&T's misrepresentations and breaches, Boom complied with its contractual obligations paying $140,000 against agreed periodic invoices of the $154,000 before realizing that D&T never intended to perform as agreed and could not deliver a final product, and Boom and the other plaintiffs otherwise complied in good faith with reasonable efforts to avoid litigation.

51.     As a result of D&T misrepresentations, breaches of contract and grossly negligent conduct, plaintiffs Boom and AnneAlise have  suffered substantial damages, including but not limited to the full amount of Boom's payments to D&T procured by fraud, direct damages for breach of contract, including the current inflated cost of completion, consequential damages constituting reasonable net profits from specific business opportunities lost due to D&T's conduct, which are currently estimated in excess of $1.3 million dollars.

iManageDB1\109846\000008\4112616.v1-3/24/22

**COUNT I**
**ALL PLAINTIFFS V. D&T (PRE AND POST EXECUTION MISREPRESENTATIONS/FRAUD)**

52.     Plaintiffs reallege the preceding allegations in their entirety as if set forth here.

53.     D&T knew prior to contracting that AnneAlise and eventually Boom insisted on a fixed fee for a completed project within a fixed and agreed time period.

54.     For example, as noted in an email from AnneAlise to Boom dated February 2, 2020:

> I am in search of a development company **for the build out of a training management software [.]**
> **With an MVP target date of May 31st and a full production goal of July 1, [2020] I would like to get started in the next couple weeks...**
>
> **After sharing the specification and discussing the project in more detail I am hoping to receive a proposal that includes: 1) A breakdown of the phases for the project with a timeline and costs – plan, build and run....**

(Emphasis added.)

55.     D&T's original motivation to steer the agreement to an open ended time and materials basis is demonstrated by its initial response which provided only a range in pricing ($364k to $414k) and sought to extend deadlines:

> Please note that we provide a bit of a range on the cost-estimates due to unknown workflows. Once we get past Phase 1 (Discovery and Planning) we will have as an output a fixed price and timetable for delivery.

56.     AnneAlise and Boom (incorporated 2/10/20) rejected contracting on that basis, insisting on both a fixed price and a deadline for completion D&T began making false statements intended to induce AnneAlise and Boom's reliance on D&T to complete the work regardless of price or timeframe.

14

57.     On February 20, 2020, after providing a reduced fixed fee bid of $331,250 D&T falsely represented that the discovery phase would take only 2 weeks with a "July 31st Complete Launch" of a "commercially active product" ready to use.

58.     As the negotiations continued, so did D&T's misrepresentations with D&T affirmatively stating that "[t]he functionality outlined for July is doable [and] [b]udget-wise: I think that this is doable under $200k."

59.     In March, 2020 D&T falsely stated that D&T would provide Boom with complete customer facing wireframes and a full site map within 15 days from the start of the contract:

> Day 8-15      D&T works on the Site Map, Features and Functionality Document, Initial Wireframes (Customer facing version). Day 16- Meeting with Boom to review Artifacts (Site-Map, F&F Document, wire Frames).

60.     In order to effectively bind plaintiffs to D&T to their detriment, D&T continued to misrepresent the cost of the project, eventually stating in the contract forms presented to Boom that D&T would complete the project within 5.5 months for a fixed fee of $154,000, knowing all along that D&T would not and could not do the work on that basis and that once Boom and AnneAlise were forced to rely on D&T, D&T would eventually be able to force them to accept a change in the agreement to time and materials abandoning all prior deadlines.

61.     After the contract was executed effective April 10, 2020, D&T continued to make misrepresentations and omissions to keep Boom and AnneAlise dependent on them, as they delayed completion of the software by providing incomplete and misaligned wireframes, failing to incorporate Boom's feedback into subsequent revisions and repeatedly seeking to change the nature of the party's agreement to Boom and AnneAlise's detriment.

62.     For example, on July 27, 2020, D&T falsely stated that in scope items were more detailed than as originally understood, and thus now somehow "out of scope" and misrepresenting the extent of Boom's feedback to the incomplete wireframes.

63.     Boom, AnneAlise, and FLX relied on D&T's pre and post execution representations regarding the timing and cost of the software development project, neither of which were true, as D&T knew prior to making such representations.

64.     Had D&T honestly disclosed that it would not perform as promised under the contract with respect to either timing or price, Boom would not have contracted, or continued to contract with D&T, thereby avoiding the direct and consequential losses resulting from such misrepresentations.

65.     Had D&T honestly disclosed to AnneAlise that it would not perform as promised under the contract with respect to either timing or price, AnneAlise and FLX would not have relied upon the promises made to Boom by D&T thereby avoiding or minimizing the losses to her and to FLX in connection with the management of the Millennium fitness facility, and the loss of the management opportunity at the Four Seasons Private Residences facility in San Francisco with 706 Mission Street CO LLC.

## COUNT II IN THE ALTERNATIVE
## BOOM V. D&T (BREACH OF CONTRACT)

66.     Plaintiffs reallege the preceding allegations in their entirety as if set forth here.

67.     Notwithstanding that it was procured by fraud, the relationship between Boom and D&T is reflected in contractual documentation.

68.     On or about December 29, 2020 after performing all of its obligations including

16

payments to D&T of $140,000 of the $154,000 contract price, Boom through counsel formally advised D&T of its contractual breaches.

69.     As of that time, D&T had failed to perform and/or materially breached its contractual obligations by failing to complete even the second phase (the design phase) of the three phase project which should have been fully completed before that time.

70.     D&T in breach of its agreement, refused further performance under the fixed fee time limited contract and instead insisted that Boom agree to pay for project completion by D&T on a time and materials basis.

71.     The parties executed a fixed fee contract for a timely finished software project as set forth in the contract documents.

72.     Boom and D&T were aware at the time of contracting of the consequences to Boom, a startup, should D&T's performance be delayed or incomplete.

73.     Boom performed, D&T failed to timely complete its performance and D&T's non-performance lead to the direct and consequential damages claimed.

74.     As a result of D&T's breaches, Boom suffered direct and consequential losses for which it seeks damages, including but not necessarily limited to the following:

    a.  Increased consulting and legal costs incurred by Boom prior to termination in an unsuccessful effort to get D&T to comply with its contractual obligations;

    b.  Increased consulting costs incurred by Boom following the parties dispute in completing D&T's incomplete design efforts to be used in selecting a replacement vendor;

iManageDB1\109846\000008\4112616.v1-3/24/22

c.  Estimated increased Project completion and expediting costs from a replacement software development vendor;

d.  Lost Boom business opportunities resulting from the delay of the completed project.

## COUNT III
## ANNEALISE, ABFIT, AND FLX  v. D&T (GROSS NEGLIGENCE)

75.  Plaintiffs reallege the preceding allegations in their entirety as if set forth here.

76.  At all relevant times, including the point of initial contact between AnneAlise and D&T regarding the project, D&T knew that AnneAlise ABFIT and FLX were reliant on D&T's grossly negligent representations regarding cost and completion timing in connection with her existing employment via FLX as the manager of the Millennium's fitness facility, and her need for the software for use via ABFIT in the SF Four Seasons Private Residences fitness facility.

77.  Armed with such knowledge, D&T had a duty to make sure that its representations and efforts regarding the cost and timing of its work for Boom were reasonably accurate, and that the software product would be available for use by AnneAlise and her fitness businesses well before the start of 2021.

78.  Instead, D&T made grossly negligent misrepresentations regarding price and timing to AnneAlise in an effort to maximize their position vis-à-vis Boom, and were grossly negligent to AnneAlise and her businesses in their botched execution of the project.

79.  As a direct and proximate result of D&T's grossly negligent conduct AnneAlise ABFIT and FLX suffered distinct and separate damages from those suffered by Boom, including but not limited to the following:

    a. Termination of her employment and non-Boom fitness business of FLX Wellness LLC in connection with the management of the Millennium facility from at least July 2020 through at least March, 2021;

    b. Lost business opportunities via ABFIT including the cancellation of the San Francisco Four Seasons Private Residences fitness center opportunity.

**COUNT IV**
**BOOM AND ANNEALISE v. D&T**
**(UNFAIR AND DECEPTIVE ACTS AND PRACTICES**
**IN VIOLATION OF GL C. 93A)**

80.    Plaintiffs reallege the preceding allegations in their entirety as if set forth here.

81.    D&T's misrepresentations and conduct as alleged herein constitute unfair and deceptive acts in trade or commerce were primarily and substantially directed toward the plaintiffs Boom and AnneAlise in Massachusetts and resulting in a loss of money and/or property in Massachusetts in violation of Massachusetts G.L. c. 93A.

82.    Upon information and belief, D&T has made similar misrepresentations to other persons under similar circumstances.

83.    D&T's conduct in violation of G.L. c. 93A at all relevant times has been both willful and knowing.

WHEREFORE, Plaintiffs seek the following relief:

    a. In Count I, damages resulting from D&T's fraudulent misrepresentations including but not limited to all amounts paid to date to Boom by D&T, ($140,000;) and amounts incurred by Boom both during and after the project in

19

rectifying D&T's design phase breaches, and in identifying and securing replacement quotations (at least $145,444); and for the cost of expedited replacement services (at least $734,000);

b.  In Count II, in the alternative, contractual damages for all of the consequences of D&T's breaches including its fraudulent misrepresentations to Boom and AnneAlise, including but not limited to the damages claims in the preceding sub paragraph;

c.  In Count III, damages suffered by AnneAlise ABFIT and FLX resulting from D&T's grossly negligent conduct, including its representations regarding pricing and completion timing, including lost business opportunities;

d.  In Count IV, damages for all actionable harm resulting from D&T' unfair and deceptive acts and practices prohibited by G.L. c. 93A, double or treble damages and attorneys' fees, as warranted under the statute; and;

e.  such other or different relief as Plaintiffs may be entitled under applicable law.

## JURY DEMAND

THE PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.

Dated: March 24, 2022

Respectfully Submitted,

Boom-OS, LLC;
AnneAlise Bonistalli;
AB Fit LLC

and

FLX Wellness, LLC
By their attorneys,

*/s/Joseph S. Sano*
Joseph S. Sano, (BBO # 545706)
jsano@princelobel.com
Tel: 617-456-8000

20

and

Daniel McGonagle (BBO# 690084)
dmcgonagle@princelobel.com
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA  02110
Tel:  617-456-8000

March 24, 2022

iManageDB1\109846\000008\4112616.v1-3/24/22